

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-16-00381-CV

---

IN THE ESTATE OF LARRY
RONALD NEAL, DECEASED

----------

FROM COUNTY COURT AT LAW NO. 2 OF WISE COUNTY
TRIAL COURT NO. PR-3670

----------

## MEMORANDUM OPINION[1] ON REHEARING[2]

----------

## I. Introduction

Larry Ronald Neal executed a will in which he bequeathed his personal property to his niece, Valorie Jean White. That much is undisputed. The determinative question in this appeal is whether under the will, Larry also devised

---

[1]*See* Tex. R. App. P. 47.4.

[2]Appellee Gary Neal has filed a motion for rehearing with respect to our November 9, 2017 opinion and judgment. *See* Tex. R. App. P. 49.1. We deny the motion. *See* Tex. R. App. P. 49.3. To address contentions that Gary raises on rehearing, we withdraw our prior opinion and substitute this opinion in its place.

his real property to Valorie. We conclude that he did not. We therefore reverse the part of the trial court's final judgment that awarded Larry's real property to Valorie and determined that no part of Larry's estate passed by intestacy, and we render judgment that Larry's real property passed through intestacy to his heirs.

## II. Facts

Larry died in 2014. Upon his death, Gary Neal, Larry's brother and his estate's executor, filed an application to probate Larry's 2009 will. The will contained the following language:

> I, Larry Ronald Neal, . . . do hereby make . . . this to be my Last Will and Testament . . . .

### Article I

> I direct my Executor to pay my judicially enforceable debts, funeral expenses[,] and the administrative expenses of my estate as soon after my death as practicable. . . .

### Article II

> I do give and bequeath to my niece, Valorie Jean (Neal) White, all my personal effects and all my tangible personal property, including automobiles, hangars, aircraft, fly-drive vehicles, patents, companies, and all other things owned by me at the time of my death, including cash on hand in bank accounts in my own name, or companies['] names, or securities, or other intangibles.
>
> . . . .

### Article IV

> I hereby grant to my Executor the continuing absolute, discretionary power to deal with any property, real or personal, held in my estate or in any trust, as freely as I might in the handling of my own affairs. Such power may be exercised independently and without the prior or subsequent approval of any court or judicial authority, and no person dealing with the Executor shall be required to inquire into

2

the propriety of any of their actions. . . . I hereby grant to my Executor the following specific powers and authority in addition to . . . powers conferred by law:

A[.]  To make distributions in cash or specific property, real or personal . . . .

B.  To sell, transfer[,] or convey, at public or private sale[,] . . . any property, real or personal, . . . constituting a part or all of my estate . . . .

C.  To compromise and settle claims in favor of or against my estate.

D.  To hold and exercise any and all powers . . . conferred by law.

In September 2015, the trial court signed an order that admitted the will to probate, appointed Gary as independent executor, and directed the court's clerk to issue letters testamentary.

The next month, Appellant Lori Neal Freitag, Larry's daughter, filed a petition for a declaratory judgment under chapter 37 of the Texas Civil Practice and Remedies Code.[3]  In her pleading, Lori contended that Article II of Larry's will entitled Valorie to receive Larry's personal property only.  Lori argued that the will did not dispose of Larry's real property and that the real property therefore passed by intestacy to her and to Larry's two sons.  She also pleaded that Gary, as independent executor, was taking the opposite position.

Gary filed an answer to Lori's petition and, through a counterclaim, also sought declaratory relief.  He argued that because Article II of the will gave Valorie "all other things owned" by Larry, the will entitled Valorie to receive Larry's real

---

[3]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011 (West 2015).

property.  He also contended that Article IV supported his interpretation of Article II because Article IV gave him the authority to sell and manage "real or personal" property.  He asserted that Larry's will "unambiguously contemplate[d] disposition of the entirety" of Larry's estate.

The trial court held a bench trial on the parties' requests for declaratory relief.[4]  After the trial, the court rendered judgment in Gary's favor.  The court found that all of Larry's real and personal property passed to Valorie under the will.

Lori raises two issues on appeal:  the trial court erred by finding that Larry's real property passed to Valorie under the will, and the trial court erred by considering extrinsic evidence to interpret the will's language.  With respect to the first issue, she argues that Article II, the will's sole provision expressly relating to the disposition of Larry's property, omits any reference to real property and unambiguously bequeaths only personal property.  In response, Gary contends that the will contains "gift language encompassing all things owned by [Larry] at the time of his death."  Gary also argues that we must apply a legal presumption against the passing of property through partial intestacy and that Article IV, which grants him authority to sell or manage real property, informs Larry's intent to dispose of real property through the language of Article II.

---

[4]We do not have a reporter's record from the trial.

## III. Principles of Construction

We review a trial court's construction of unambiguous language in a will de novo. *Jinkins v. Jinkins*, 522 S.W.3d 771, 779 (Tex. App.—Houston [1st Dist.] 2017, no pet.). When a trial court's construction of an unambiguous term in a will is erroneous, we will reverse the trial court's judgment and render the judgment that the trial court should have rendered. *See In re Estate of Slaughter*, 305 S.W.3d 804, 812 (Tex. App.—Texarkana 2010, no pet.).

The principles that we use in construing a will are familiar and settled:

> The cardinal rule for construing a will is that the testator's intent must be ascertained by looking at the language and provisions of the instrument as a whole, as set forth within its four corners. The question is not what the testator intended to write, but the meaning of the words he actually used. Terms used are to be given their plain, ordinary, and generally accepted meanings unless the instrument itself shows them to have been used in a technical or different sense.

> If possible, all parts of the will must be harmonized, and every sentence, clause, and word must be considered in ascertaining the testator's intent. We must presume that the testator placed nothing meaningless or superfluous in the instrument. Where practicable, a latter clause in a will must be deemed to affirm, not to contradict, an earlier clause in the same will.

> Whether a will is ambiguous is a question of law for the court. A term is not ambiguous merely because of a simple lack of clarity or because the parties proffer different interpretations of a term. Rather, a will is ambiguous only when the application of established rules of construction leave its terms susceptible to more than one reasonable meaning. If the court can give a certain or definite legal meaning or interpretation to the words used, the will is unambiguous, and the court should construe it as a matter of law.

*Steger v. Muenster Drilling Co.*, 134 S.W.3d 359, 372–73 (Tex. App.—Fort Worth 2003, pet. denied) (footnotes omitted); *see also Jinkins*, 522 S.W.3d at 780

5

(explaining that a court may not redraft a will to vary or add provisions under the guise of construing the language of the will to reach a presumed intent).

When construing documents, including wills, we "cannot divorce text from context." *In re Office of the Attorney Gen. of Tex.*, 456 S.W.3d 153, 155–56 (Tex. 2015) (orig. proceeding). In other words,

> The meaning of words read in isolation is frequently contrary to the meaning of words read contextually in light of what surrounds them. Given the enormous power of context to transform the meaning of language, courts should resist rulings anchored in hyper-technical readings of isolated words or phrases. The import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and phrases that are inordinately context-sensitive.

*Id.*; *see In re Estate of Tyner*, 292 S.W.3d 179, 182 (Tex. App.—Tyler 2009, no pet.) (explaining that language of a "single clause [in a will] will not govern, but must be read in the context of the entire instrument"). When the meaning of language used in a will has been settled by usage and sanctioned by judicial decisions, it is presumed to be used in the sense that the law has given to it, and should be so construed, unless the context of the will shows a clear intention to the contrary. *Stephens v. Beard*, 485 S.W.3d 914, 917 (Tex. 2016).

### IV. Distinction Between Real and Personal Property

The question here is whether Larry gave Valorie his real property or only his personal property. Real property includes "estates and interests in land, whether corporeal or incorporeal or legal or equitable. The term does not include a real

6

chattel."[5]  Tex. Est. Code Ann. § 22.030 (West 2014); *see also* Tex. Tax Code Ann. § 1.04(2) (West 2015) (defining "real property" as an interest in land, an improvement, a mine or quarry, a mineral in place, or standing timber). Personal property includes an interest in goods, money, a chose in action, an evidence of debt, and a real chattel.  Tex. Est. Code Ann. § 22.028 (West 2014); *see* Tex. Tax Code Ann. § 1.04(4) (explaining that personal property is "property that is not real property").  When a testator bequeaths "property" without qualification as to real or personal, the bequest "encompasses everything of exchangeable value that the testator owned."  *In Estate of Setser*, No. 01-15-00855-CV, 2017 WL 444452, at *3 (Tex. App.—Houston [1st Dist.] Feb. 2, 2017, no pet.) (mem. op.) (citing *Ellet v. McCord*, 41 S.W.2d 110, 112 (Tex. Civ. App.—Austin 1931, writ ref'd)).  On the other hand, we will enforce a testator's expressed intent to pass less than all of the testator's property through a will.  *See Carr v. Rogers*, 383 S.W.2d 383, 385 (Tex. 1964) (explaining that a court must enforce a will's provision that "clearly indicates that some of the property has not been disposed of").

## V. Construction of Larry's Will

### A. The Will's Plain Language

As explained above, Article II of Larry's will states that he gave Valorie

> all [his] personal effects and all [his] tangible personal property, including automobiles, hangars, aircraft, fly-drive vehicles, patents,

---

[5]A real chattel, also known as a chattel real, is a real property interest "that is less than a freehold or fee, such as a leasehold estate."  *Chattel Real*, Black's Law Dictionary (10th ed. 2014).

companies, and all other things owned by [him] at the time of [his] death, including cash on hand in bank accounts in [his] own name, or companies['] names, or securities, or other intangibles.

The principles of construction recited above—most importantly discerning Larry's intent from the plain meaning of the words he used—compel us to hold that Larry's will did not devise his real property to Valorie. We read Article II as containing three dispositive phrases.

First, Larry gave Valorie "all [his] personal effects." This phrase describes a subset of personal property. *See Dearman v. Dutschmann*, 739 S.W.2d 454, 455 (Tex. App.—Corpus Christi 1987, writ denied) (explaining that "personal effects" are "articles of personal property" that bear an intimate relation to a person, such as "clothing, jewelry, and similar chattels"); *see also Teaff v. Ritchey*, 622 S.W.2d 589, 591–92 (Tex. App.—Amarillo 1981, no writ) (defining "personal effects" to include items such as "clothes, toilet articles, eye glasses[,] and dentures").

Second, Larry gave Valorie "all [his] *tangible personal property*, including automobiles, hangars, aircraft, fly-drive vehicles, patents, [and] companies." [Emphasis added.] Nothing within this phrase indicates Larry's intent to devise real property; instead, the phrase explicitly and by example describes personal property. *See, e.g.*, *Morrison v. Campbell*, 431 S.W.3d 611, 614 (Tex. App.—Fort Worth 2014, no pet.) (stating that in the insurance context, a vehicle is personal property); *Jones v. Cooper Indus.*, 938 S.W.2d 118, 123 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (recognizing that in a breach of patent case, a patent is personal property), *cert. denied*, 522 U.S. 1112 (1998).

8

Third, Larry gave Valorie "all other things owned by [him] at the time of [his] death, including[6] cash on hand in bank accounts in [his] own name, or companies['] names, or securities, or other intangibles." Larry contends that the "all other things" phrase devised his real property to Valorie. As stated above, however, we must consider those words in context. *Office of the Attorney Gen.*, 456 S.W.3d at 155–56. Larry expressly linked "all other things" to bank account balances, which are intangible personal property;[7] to securities, which are intangible personal property;[8] and to "other intangibles," a reference to the intangible personal property he had just described. Thus, we hold that without ambiguity, when read in context, the plain meaning of "all other things owned by

---

[6]On rehearing, Gary cites several cases to argue that the term "including" generally expands, rather than restricts, the construction of words that follow the term. *See, e.g.*, *Houston Bank & Tr. Co. v. Lansdowne*, 201 S.W.2d 834, 838 (Tex. Civ. App.—Galveston 1947, writ ref'd n.r.e.) (stating that "including" generally acts as a term of enlargement, not limitation). Gary contends that our holding applies the term "including" restrictively rather than expansively. To the contrary, our construction of Larry's will gives "including" an enlarging effect by recognizing that he intended to give Valorie all of his intangible personal property, not just the types of intangible personal property expressly designated in the words following "including"—cash in bank accounts and securities. We reject, however, Gary's proposal for us to construe "including" so expansively that the term encompasses property (real estate) outside the plain meaning gathered from the context of Article II's language.

[7]*See Hendricks v. Thornton*, 973 S.W.2d 348, 356 (Tex. App.—Beaumont 1998, pet. denied); *Bailey v. State*, 885 S.W.2d 193, 199 (Tex. App.—Dallas 1994, pet. ref'd); *Lochabay v. Sw. Bell Media, Inc.*, 828 S.W.2d 167, 171 (Tex. App.—Austin 1992, no writ).

[8]*See City of Dallas v. Tex. Prudential Ins. Co.*, 291 S.W.2d 693, 694 (Tex. 1956); *Hendricks*, 973 S.W.2d at 356.

9

me at the time of my death" is that Larry gave Valorie, without limitation, what remained of his personal property that was not encompassed in personal effects or tangible personal property, namely, his intangible personal property.[9]

Considering all three phrases together, nothing within Article II, the only provision within the will that that purports to dispose of Larry's property, expressly or implicitly refers to his real property. The natural, plain meaning of Article II is that the article applies to tangible and intangible personal property, not real property.

Gary presents several arguments to the contrary. None of them persuade us.

_____

[9]The parties do not cite to any case, nor have we found any case in which a court decided whether the word "thing" in a will normally includes real property, and we make no such holding here. Instead, we conclude that in the context of Larry's will, "thing" does not include real property.

The decisions that Gary relies on to the contrary are distinguishable because in those cases, context or circumstantial evidence indicated the testator's intent to devise real and personal property. *See, e.g.*, *Gilkey v. Chambers*, 207 S.W.2d 70, 72–73 (Tex. 1947) (holding that "personal property" included real property when it was evident from other facts that the testator intended "personal" to mean property that she owned individually rather than in partnership with her son); *In re Estate of Abshire*, No. 02-10-00060-CV, 2011 WL 3671998, at \*5–6 (Tex. App.—Fort Worth Aug. 18, 2011, pet. denied) (mem. op.) (holding that the word "funds" in a holographic will could be liberally construed and that given context that did not indicate an intent to limit the meaning of the word, the word encompassed real or personal property); *Mortenson v. Trammell*, 604 S.W.2d 269, 272–73 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.) (concluding that the phrase "all property" encompassed real property and personal property when context did not show a limiting intent by the testator).

## B. The Presumption Against Partial Intestacy

First, Gary argues that we must apply a presumption against partial intestacy. We generally apply a strong presumption against partial intestacy in the presence of an executed will.[10] *Harrington v. Walker*, 829 S.W.2d 935, 937 (Tex. App.—Fort Worth 1992, writ denied); *see Shriner's Hosp. for Crippled Children of Tex. v. Stahl*, 610 S.W.2d 147, 151 (Tex. 1980) ("The mere making of a will is evidence that the testator had no intent to die intestate and creates a presumption that the testator intended to dispose of his entire estate, and that he did not intend to die intestate as to the whole or any part of his property.").

The presumption "must yield," however, when the "the testator, through design or otherwise, has failed to dispose of his entire estate." *Harrington*, 829 S.W.2d at 937 (collecting cases); *see Shriner's Hosp.*, 610 S.W.2d at 151 ("All rules of construction must yield to the basic intention and purpose of the testator as reflected by the entire instrument."); *Renaud v. Renaud*, 707 S.W.2d 750, 751 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.) ("However strong [the presumption against partial intestacy] might be, it does not authorize the court to make a new will."). Here, the presumption must yield. As explained above, Article II clearly expresses Larry's intent to dispose only of his personal property, and despite the

---

[10]The presumption against partial intestacy is especially strong when a will contains a residuary clause. *See Dudley v. Jake & Nina Kamin Found.*, No. 01-12-00579-CV, 2014 WL 298270, at *3–4 (Tex. App.—Houston [1st Dist.] Jan. 28, 2014, no pet.) (mem. op.) (applying the presumption in that circumstance). Larry's will does not contain a dispositive residuary clause.

presumption against partial intestacy, we are not permitted to rewrite Larry's will. *See Harrington*, 829 S.W.2d at 935; *see also Huffman v. Huffman*, 339 S.W.2d 885, 890 (Tex. 1960) (explaining that the presumption is "but one of the factors to be considered in arriving at the intention of the testatrix as expressed in the will itself"); *In re Wilson*, No. 13-10-00541-CV, 2011 WL 3855461, at *4 (Tex. App.—Corpus Christi Aug. 31, 2011, no pet.) (mem. op.) (declining to apply the presumption when the will did not dispose of the decedent's entire estate); *Renaud*, 707 S.W.2d at 751–54 (holding the same).

## C. The Effect of Article IV

Gary further asserts that even if Article II does not expressly dispose of Larry's real property, other language within the will expresses an intention to do so. *See Steger*, 134 S.W.3d at 372 ("[E]very sentence, clause, and word must be considered in ascertaining the testator's intent."). Specifically, Gary relies on the language within Article IV (which we have quoted above) that allows him to dispose of and convey "any property, real or personal," in distributing the estate. He argues, "Granting the Independent Executor power to sell, convey[,] or distribute real property clearly indicates [Larry] intended real property to pass" under the will. For two reasons, we disagree.

First, the law permits an independent executor in circumstances such as these to exercise control over real property even when that property passes through intestacy. *See Freeman v. Banks*, 91 S.W.2d 1078, 1080 (Tex. Civ. App.—Fort Worth 1936, writ ref'd) ("It is elementary that the executor has the right

12

of possession of the estate. . . . It is elementary that property of a deceased, going into the hands of either a devisee under the will, or to an heir by descent and distribution, is taken subject to the debts and costs of administration."); *see also* Tex. Est. Code Ann. §§ 101.001(b), .051(b)(1) (West 2014) (together stating that the estate of a person who dies intestate vests immediately in the person's heirs subject to payment for the decedent's debts), § 355.109 (West 2014) (stating that "property not disposed of by will, but passing by intestacy" is liable for debts and expenses of administration); *Meekins v. Wisnoski*, 404 S.W.3d 690, 698 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("The administrator of the estate holds legal title and a superior right to possess estate property and to dispose of it as necessary to pay the debts of the estate."). Given that the law permits an independent executor to exercise control over real property that passes through intestacy, it is not surprising or consequential that Larry's will does the same. Thus, we disagree with Gary's contention that Article IV reveals Larry's intent to give his real property to Valorie.

Second, and perhaps more importantly, Larry's reference to "real or personal" property in Article IV confirms that he knew the difference between those two types of property—indeed, he distinguished real from personal property three times in Article IV—and that he referred to both when intending to do so. In that regard, Article IV weighs against Gary's proposed interpretation of the will.

13

**D. Article II's Inclusion of "Hangars"**

Finally, Gary contends that Article II's reference to "hangars" indicates that Larry intended to dispose of both real and personal property because, according to him, a hangar is real property. Again, we disagree.

First, regardless of whether hangars may actually be real or personal property, the language within Article II establishes Larry's belief that hangars were among the other items that he classified as "tangible personal property." Article II states in part, "I do give and bequeath to my niece . . . all my personal effects and all my *tangible personal property, including* . . . hangars . . . ." Thus, we cannot conclude that merely by referring to "hangars" (and by perhaps mislabeling them as personal property), Larry intended to give all his real property to Valorie.

Second, under the circumstances, Larry's belief that his interest in "hangars" qualified as personal property may not have been misplaced. The record contains a "Hangar Lease and Reversion Agreement" between Larry and the City of Bridgeport. That agreement explains that the city leased land to Larry so that he could build and operate a hangar for thirty years. The agreement also states that any additions to the leased premises, including hangars, would become the city's property if not removed within 120 days of the expiration of the thirty-year term. In other words, Larry's hangar was not necessarily a permanent addition to the city's real property; the parties to the lease contemplated that it was removable. Thus, under the lease, Valorie's permanent interest in the hangar itself, if any, is tied to its removability, a recognized characteristic of personal property. *See Norris v.*

14

*Thomas*, 215 S.W.3d 851, 857 (Tex. 2007) ("Movable chattels do not possess the characteristics of a fixture attached to real property and do not acquire the character of realty."); *Corral-Lerma v. Border Demolition & Envtl. Inc.*, 467 S.W.3d 109, 124 (Tex. App.—El Paso 2015, pets. denied) (explaining that personal property retains its character when it is attached to realty but does not become a permanent part of the realty); *see also Realty*, Black's Law Dictionary 1456 (stating that realty is land and anything attached to land that "cannot be removed without injury to the land"); Webster's Third New International Dictionary 1890 (1981) (defining "real estate" as "land and its permanently affixed buildings or other structures").

If not removable, the hangar was real property. However, in that circumstance, according to the lease, the hangar would belong to Bridgeport. Thus, the real property would not have been Larry's to devise. If removable, the hangar was personal property belonging to Larry.

In either scenario, the hangar cannot reasonably be viewed as real property that Larry intended to devise to Valorie. It was either removeable personal property that Larry bequeathed to Valorie, or it was real property that Larry knew, by virtue of the lease agreement he signed, that he had no ownership rights to.

**E. Our Decision**

Applying the principles for will construction detailed above, including discerning Larry's intent from all the will's provisions, Larry unambiguously bequeathed his tangible and intangible personal property to Valorie and allowed

15

his real property to pass through intestacy.[11]  *See Steger*, 134 S.W.3d at 372–73.

We sustain Lori's first issue.  Having sustained her first issue, we do not reach her

second issue, in which she argues that the trial court erred to the extent that it

considered extrinsic evidence.  *See* Tex. R. App. P. 47.1 ("The court of appeals

must hand down a written opinion that is as brief as practicable but that addresses

every issue raised and necessary to final disposition of the appeal.").

---

[11]Gary argues that we should not apply the doctrine of *ejusdem generis* in construing Larry's will.  Because we conclude that Larry's will is unambiguous, we do not apply that doctrine.  *See Hennig v. Didyk*, 438 S.W.3d 177, 188 (Tex. App.— Dallas 2014, pet. denied) (explaining that the doctrine of *ejusdem generis* applies only to an ambiguous document).

Moreover, given our holding that the will is unambiguous and may be construed solely on its explicit language, we disagree with Gary's argument that in this case, the lack of a reporter's record from the trial creates a presumption that requires us to affirm the trial court's judgment.  Any extrinsic evidence admitted at trial would not affect our interpretation of Larry's unambiguous intent.  *See San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 641 (Tex. 2000) ("Ruth's use of the term 'real property' in her will is unambiguous.  As a result, any sort of background, historical extrinsic evidence to explain her will is unnecessary, and the probate court did not err in excluding it."); *Merrick v. Helter*, 500 S.W.3d 671, 674 (Tex. App.—Austin 2016, pet. denied) ("Only if there is ambiguity or uncertainty in the meaning of a term used can extrinsic evidence come into play."); *see also* Tex. R. App. P. 34.1 ("The appellate record consists of the clerk's record and, *if necessary to the appeal*, the reporter's record." (emphasis added)); *The Kroger Co. v. Am. Alternative Ins. Corp.*, 468 S.W.3d 766, 769 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (explaining that when no reporter's record is necessary, an appellate court should not "presume that the omitted reporter's record . . . supports the trial court's judgment").

## VI. Conclusion

Having sustained Lori's first issue, we reverse the trial court's judgment in part. We render judgment that under the terms of Larry's will, his personal property passed to Valorie, and his real property passed by intestacy to his heirs.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; KERR and PITTMAN, JJ.

DELIVERED:  January 4, 2018

17